UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

AD FX INTERNATIONAL FUND LLC, by  :
and through The Diversified Group
Incorporated, its Tax Matters Partner,  :

      Plaintiff,  :  05-Civ. _____

  -vs-  :  **COMPLAINT**

UNITED STATES OF AMERICA,  :

      Defendant.  :

------------------------------------ X

## Nature of the Case

1.    This is a federal income tax proceeding, brought pursuant to 26 U.S.C. § 6226(a), seeking readjustment of the partnership items of AD FX International Fund LLC ("ADFXIF") for the tax year ended December 31, 1999.

2.    Plaintiff seeks a readjustment of the adjustments made by the defendant, through its agency, the Internal Revenue Service of the Department of the Treasury (the "IRS"), in a Notice of Final Partnership Administrative Adjustment ("FPAA"), dated July 28, 2005. A copy of the FPAA is annexed hereto as Exhibit A.

## The Parties

3.    ADFXIF is a limited liability company formed under the laws of the State of Delaware, with its principal place of business at 950 Third Avenue, New York, New York. Under 26 U.S.C. §§ 761(a) and 7701(a)(2) and the regulations thereunder, ADFXIF is classified as a partnership for tax purposes and its members are classified as partners. Its Taxpayer

Identification Number is 13-4079140. Its United States Partnership Return (Form 1065) for the year 1999 was filed with the Internal Revenue Service Center in Holtsville, New York.

4. The tax matters partner of ADFXIF, and the Plaintiff herein, is The Diversified Group Incorporated ("Diversified").

5. Defendant is the United States of America, sued herein to review the actions of its agency, the IRS.

### Jurisdiction and Venue

6. This Court has jurisdiction over the subject matter of this action pursuant to 26 U.S.C. § 6226(a)(2) and 28 U.S.C. § 1346(e).

7. Venue is proper in this district pursuant to 26 U.S.C. § 6626(a)(2).

8. This action is timely pursuant to 26 U.S.C. § 6626(a).

### Deposit

9. Diversified reported its share of the partnership losses of ADFXIF on its U.S. Corporate Income Tax Return (Form 1120) for the year 1999, but Diversified reported a net loss on that return and would have reported a net loss even without taking into account the losses attributable to ADFXIF. Diversified's tax liability would therefore not be increased as a result of the adjustments made in the FPAA and, accordingly, no deposit is required. Alternatively, if it is determined that any deposit is required, Diversified will timely make such deposit pursuant to 26 U.S.C. § 6226(e)(1).

### Factual Allegations

10. On November 1 or November 2, 1999, various individuals (the "Investors") each entered into two European-style digital options on a foreign currency with Lehman Brothers Commercial Corporation ("Lehman"), a purchased, or "long" option (the "Long Option") and a

sold, or "short" option (the "Short Option"). Each option was to expire at 10:00 A.M. 51 days later (for the Nov. 1 trades) or 50 days later (for the November 2 trades) ("Expiration").

11.     Under the Long Option, each Investor paid Lehman a premium in U.S. dollars. In exchange, Lehman would pay the Investor a multiple of that premium in the U.S. dollar equivalent of that foreign currency if the Long Option was in the money at Expiration.

12.     Under the Short Option, Lehman paid the Investor a premium in U.S. dollars. In exchange, the Investor would pay Lehman a multiple of that premium in the U.S. dollar equivalent of that foreign currency if the Short Option was in the money at Expiration. Otherwise, the Short Option would expire worthless.

13.     In practice, the Investor paid Lehman a net premium equal to the difference between the premiums for the Long Option and the Short Option.

14.     Each Investor paid an advisory fee to Diversified in connection with the transaction and a bid-ask spread under the Options.

15.     In each case, (i) if at Expiration both the Long Option and Short Option were in the money, Lehman would pay a net amount in the U.S. dollar equivalent of that foreign currency, resulting in a profit of at least a certain amount after the advisory fee (more if the spot price at Expiration differed from the strike price) (ii) if at Expiration both the Long Option and Short Option were out of the money, the Investor would forfeit the net premium; and (iii) if at Expiration only the Long Option was in the money, Lehman would pay the Investor on the Long Option, and the Short Option would expire worthless, resulting in a windfall to the Investor. At the outset, in each case the probabilities of events (i) and (ii) were, respectively, approximately 15% and 85%. The probability of event (iii) was small but finite.

16.     Each Investor was aware of these probabilities when it acquired the Options.

17. The terms of each of the Long Option and the Short Option (together, the "Options") were set out in separate confirmations.

18. Each Long Option and Short Option could be transferred or assigned independently of each other, provided Lehman's credit requirements were met.

19. ADFXIF was formed on October 31, 1999, initially with two members who also acted as managers, Alpha Consultants LLC ("Alpha") and Diversified.

20. On November 3, 1999, Alpha and Diversified each contributed $50,000 to ADFXIF in exchange for a 50% membership interest. A portion of this cash was used to acquire options on the Canadian dollar.

21. On November 8, 1999, each Investor contributed or assigned his interests in the Options to ADFXIF in exchange for a member interest equal to the then-percentage that the net fair market value of the Options was of the net fair market value of all of ADFXIF's assets.

22. As of the time of these contributions, the probabilities that the Options would result in a profit to ADFIX were commensurate with the amount of that profit.

23. Alpha, Diversified, and ADFXIF paid no fees to third parties in connection with the transactions described above other than arms-length bid-ask spread on the Canadian dollar options acquired by ADFXIF.

24. The Investors' investment in ADFXIF resulted in diversification of their investments, which was a purpose for such investment.

25. Under ADFXIF's operating agreement, profit and loss were shared in proportion to the members' capital accounts, and on resignation, a member was entitled to receive the amount of his capital account, which, in accordance with Article VII of the Operating Agreement, was equal to his proportionate share of the fair market value of ADFXIF's assets.

26. On December 20, 2001, each of the Investors resigned as a member of ADFXIF and received, in full redemption of his member interest, payment in foreign currency equal to the fair market value of the Investor's interest at that time.

27. The amounts paid and to be paid under the Options, the probabilities of each of the events, and the Options' fair market value were determined based on the Black-Scholes Model. The model was developed in 1973 by Fisher Black and Myron Scholes to evaluate European-style options on non-dividend paying stocks and has been modified over the years and extended to evaluations of options on foreign currencies. The model has several components, almost all consisting of fixed items (*e.g.*, the term or strike price) or data for which regular quotes exist (*e.g.*, the forward price of the underlying property). The one subjective component is volatility, which was in effect negotiated by the parties based on numbers quoted by dealers.

28. The profit probability determined by the Black-Scholes Model is based on statistics and assumes random fluctuation in the value of the underlying property, akin to the flip of a coin. However, the movement in the price of foreign currency is not in fact random, and many skilled financial professionals believe that they can forecast it. Thus, this probability is not determinative in an individual case, and a well-informed investor might enter into the Options in the reasonable belief that the payoff is justified by the actual likelihood, as opposed to the statistical likelihood, of a profit.

29. At the time each Investor entered into the Options, the Investor was under no obligation to contribute them to ADFXIF.

30. Each Investor acquired the Options with the intent of making a profit therefrom, and contributed or assigned the Options to ADFXIF with the intent of making a profit from its share of ADFXIF's assets, including the Options.

31. Alpha and Diversified made their contributions to ADFXIF with the intent of making a profit from their shares of ADFXIF's assets, including the Options.

32. Alpha and Diversified were aware of the potential economic profits and the probabilities thereof at the time of the Investors' contributions to ADFXIF.

33. On its federal income tax return, ADFXIF took the position that it had received the Options from the Investors as contributions to a partnership within the meaning of 26 U.S.C. § 721, with carryover bases determined under 26 U.S.C. § 723. Therefore, on expiration of the Options it recognized total net tax losses of $668,000 equal to the difference between (i) the amounts the Investors paid or received with respect to the Options and (ii) the zero value of the Options at their expiration. This tax loss represented a net economic loss on the Options.

34. In addition, ADFXIF recognized a net loss of $115 on the Canadian dollar options it had acquired.

35. Following is a table of each Investor, the nature of the foreign currency underlying the Options entered into, the net premium paid to Lehman, the minimum potential net payment from Lehman in U.S. dollars and minimum net profit to the Investor (after the advisory fee) in U.S. dollars if the Options were in the money at Expiration, the net value of the Options upon their contribution to ADFIX, and the amount received by the Investor upon resignation from ADFIX:

| Name of Investor | FX | Net Premium Paid | Net Potential Payment | Net potential Profit | Value on Contribution | Amount Received on Resignation |
|---|---|---|---|---|---|---|
| Alan Stein | CAD[1] | $40,000 | $164,177 | $64,177 | $18,261 | CAD 5,715 |
| Greg Muldoon | CAD | $120,000 | $492,530 | $192,530 | $54,784 | CAD 17,146 |
| Eddie Norwood | CAD | $68,000 | $279,101 | $109,101 | $31,044 | CAD 9,717 |
| J. Fred Snyder | Yen[2] | $60,000 | $230,710 | $80,710 | $40,445 | CAD 12,656 |
| Norman Myers | AUD[3] | $200,000 | $782,855 | $282,855 | $105,738 | CAD 33,095 |
| Jeff Curtis | Yen | $120,000 | $461,420 | $161,420 | $80,891 | CAD 25,327 |
| Hugh Dillingham | Yen | $60,000 | $230,710 | $80,710 | $40,445 | CAD 12,656 |

## Assignments of Error

36. ADFXIF alleges that the FPAA is erroneous, in the particulars set forth herein below, among others.

37. (a) The FPAA asserts that ADFXIF should be disregarded and its transactions should be treated as engaged in directly by its members. The FPAA asserts this position by alleging alternatively that: (i) the existence of ADFXIF has not been "established . . . as a matter of fact"; (ii) ADFXIF was a "sham"; (iii) ADFXIF and its activities "had no business purpose other than tax avoidance"; (iv) ADFXIF lacked economic substance; or (v) ADFXIF should be disregarded under 26 C.F.R. § 1.701-2 because it was formed or availed of in connection with a transaction or transactions, a principal purpose of which was or were to reduce substantially the present value of its partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code.

(b) These positions are erroneous. ADFXIF's existence is established by a Certificate of Formation filed with the Delaware Secretary of State and an Operating Agreement, the latter of which was presented to the IRS. ADFXIF was not a "sham" because the

---

[1] Canadian dollar
[2] Japanese yen
[3] Australian dollar

transactions described above actually occurred. ADFXIF had the business purpose of making an economic profit from trading in the options. In the alternative, no business purpose is required for a partnership's existence to be respected for tax purposes. ADFXIF did not lack economic substance because the parties to the transactions had both the subjective intent and the actual ability to make an economic profit from the transactions. 26 C.F.R. § 1.701-2 is not implicated because the claimed tax result is not inconsistent with the intent of Subchapter K of the Internal Revenue Code. In the alternative, 26 C.F.R. § 1.701-2 is invalid because, *inter alia*, without grant of legislative authority it purports to disregard entities that would be respected as partnerships under tax common law; and ADFXIF would be so classified.

38. (a) The FPAA asserts that the foreign currency options should be treated as never having been contributed to or assumed by ADFXIF; that the gains and losses relating to such options should not be treated as having been realized by ADFXIF; and that the members of ADFXIF should not be treated as being partners in ADFXIF.

(b) The IRS lacks the legal power to make such assertions in the FPAA because, under 26 U.S.C. § 6221 *et seq.*, an FPAA may be issued only with respect to "partnership items" as defined in 26 U.S.C. § 6231(a)(3) and 26 C.F.R. § 301.6231(a)(3)-1(a). The members' status as partners and whether the Investors should be treated as having contributed the Options to ADFXIF are not "partnership items" as so defined and, accordingly, cannot be the subject of an FPAA.

(c) In the alternative, even if these assertions could be made in an FPAA, they are nonetheless erroneous. The contribution of the Options resulted in economic ownership by ADFXIF of assets with a net fair market value of $371,608 at the time of their contribution. The operating agreement for ADFXIF demonstrates that all of its members shared in all of its

economic profits and losses and the economic status of the members changed by virtue of their contributions to ADFXIF, and therefore all of ADFXIF's members were partners in a legal and economic sense.

39.     (a) The FPAA asserts that contributions to ADFXIF will or may be adjusted to clearly reflect what the IRS believes to be the income of ADFXIF or its members.

(b) Such an adjustment is not a "partnership item," and the IRS therefore is without power to make such an adjustment in an FPAA.

(c) In the alternative, even if such an assertion could be made in an FPAA, it is nonetheless erroneous, in that such contributions may not be so adjusted because 26 U.S.C. § 482 does not apply to these transactions and the IRS has no other statutory authority under which it may make such an adjustment.

40.     (a) The FPAA asserts that (i) the undertakings under the Short Options are "obligations" constituting "liabilities" for purposes of 26 C.F.R. § 1.752-6T, and that 26 C.F.R. § 1.752-6T therefore reduces the Investors' bases in ADFXIF by amounts set out in the FPAA; (ii) the amount treated as contributed by the partners is reduced by the amounts received by the contributing partners from the contemporaneous sales of the call options to the same counterparty; and (iii) in the case of a sale, exchange, or liquidation of ADFXIF's partners' partnership interests, the partners' basis in such interests has not been established to be greater than zero.

(b) These issues are not "partnership items," and the IRS therefore is without power to assert them in an FPAA.

(c) In the alternative, even if these assertions could be made in an FPAA, they are nonetheless erroneous for various reasons, including that the amounts of the bases reduction set

forth in the FPAA do not correspond to the premium paid for the Short Option and that 26 C.F.R. § 1.752-6T is invalid because it is not authorized by statute.

(d) In the alternative, even if these assertions are not erroneous, they are irrelevant for purposes of determining whether Alpha and Diversified may deduct their shares of the losses recognized by ADFXIF on expiration or disposition of the Options.

41. (a) The FPAA asserts that Diversified and Alpha each had zero basis in their interests in ADFXIF.

(b) This issue is not a "partnership item" and the IRS is therefore without power to assert it in an FPAA.

(c) In the alternative, even if this assertions could be made in an FPAA, it is nonetheless erroneous because the initial basis of Diversified or Alpha in its interest equals the amount of cash it contributed to ADFXIF.

42. (a) The FPAA asserts that 26 U.S.C. § 165(c)(2) precludes ADFXIF's members from deducting losses from this transaction.

(b) This issue is not a "partnership item," and the IRS therefore lacks the power to assert it in an FPAA.

(c) In the alternative, even if this assertion could be made in an FPAA, it is nonetheless erroneous. Each of the members had the requisite profit motive to deduct losses from this transaction.

43. (a) The FPAA asserts that the net loss, including interest expense, claimed by ADFXIF was $668,115 for the taxable year 1999, and that this amount is disallowed.

(b) This assertion is erroneous. This loss is not properly disallowed because it represents a net tax and economic loss incurred and recognized by ADFXIF.

44. (a) The FPAA asserts that the adjusted bases of Long Options and other property contributed by the members to ADFXIF have not been established under 26 U.S.C. § 723 to be greater than zero.

(b) The IRS lacks the power to make this assertion in an FPAA because each member's adjusted basis in property it acquired is not a "partnership item."

(c) Alternatively, even if this assertion could be made in an FPAA, it would nonetheless be erroneous. ADFXIF has established such adjusted bases by presenting the IRS with the confirmations for the transactions in which the Options were acquired. In addition, Alpha's and Diversified's bases in their contributions equals the amount of their cash contributions, and this information was also furnished to the IRS.

45. (a) The FPAA asserts that the members have not established that their bases in their interests in ADFXIF was greater than zero.

(b) The IRS lacks the power to make this assertion in an FPAA because the members' bases in ADFXIF is not a "partnership item."

(c) In the alternative, even if this assertion could be made in an FPAA, it would nonetheless be erroneous. The members' outside bases are properly computed based on their cost of the property or cash contributed in exchange for their interests, and this information was furnished to the IRS.

46. (a) The FPAA asserts that the members of ADFXIF are subject to penalty under 26 U.S.C. §§ 6662(b)(2) and 6662(d) because there was a substantial understatement of income tax, there was no substantial authority for the positions taken, and that the exception under 26 U.S.C. § 6662(d)(2)(B) does not apply because there was no showing of reasonable belief, within

the meaning of 26 U.S.C. § 6662(d)(2)(C)(i)(II), by ADFXIF or its members that the tax positions they took were more likely than not the correct treatment.

(b) Insofar as this determination relates to matters that, as alleged above, are not "partnership items," the IRS lacks the power to assert it in an FPAA.

(c) In the alternative, even if this assertion could be made in an FPAA, it would nonetheless be erroneous. There was no understatement because the positions taken by ADFXIF and its members were correct. In the alternative, even if there was an understatement, the exception under 26 U.S.C. § 6662(d)(2)(B) applies because the position taken had substantial authority and ADFXIF and its members had the reasonable belief that these were more likely than not correct. Even if there was an understatement, in the case of Alpha or Diversified it was not "substantial."

47. (a) The FPAA asserts that the members are subject to penalty under 26 U.S.C. §§ 6662(b)(3) and 6662(h) because there was a gross valuation misstatement.

(b) Insofar as this determination relates to a matter that is not a "partnership item," the IRS has no power to assert in an FPAA.

(c) In the alternative, even if this issue could be asserted in an FPAA, it is nonetheless erroneous. There was no gross valuation misstatement because the positions taken by ADFXIF and its members were correct and, even if they were not, because there was no misstatement of value; the IRS has never claimed that the value of the Options is other than as stated by ADFXIF.

48. (a) The FPAA asserts that ADFXIF's members are subject to penalty under 26 U.S.C. §§ 6662(b)(1) and 6662(c) because there existed negligence or disregard of rules or regulations.

(b) Insofar as this determination relates to a matter that is not a "partnership item," the IRS has no power to assert it in an FPAA.

(c) In the alternative, even if this issue could be asserted in an FPAA, it is nonetheless erroneous. ADFXIF and its members made a reasonable attempt to comply with the provisions of Title 26. They did not disregard any rules or regulations, but even if they did so, they did not do so in a manner that was careless, reckless, or intentional.

49. (a) The FPAA asserts that, to the extent ADFXIF's members would otherwise be subject to penalty under 26 U.S.C. § 6662, the "reasonable cause" exception under 26 U.S.C. § 6662(c)(1) does not apply because they have not shown reasonable cause or have failed to act in good faith.

(b) Insofar as this determination relates to matters that are not "partnership items," the IRS lacks the power to assert it in an FPAA.

(c) In the alternative, to the extent this issue can be asserted in an FPAA, it is nonetheless erroneous, because ADFXIF and its members acted with reasonable cause and in good faith.

WHEREFORE, Diversified prays that this Court:

(1) Strike from the FPAA all determinations relating to matters that are not "partnership items" properly the subject of an FPAA; and, or in the alternative,

(2) Readjust the items adjusted in the FPAA and determine that (i) the existence of ADFXIF as a partnership for tax purposes and the members' status as partners therein may not be disregarded under the applicable regulations or common law; (ii) the losses claimed by ADFXIF in the amount of $668,115 for the taxable year 1999 are allowable; and (iii) no penalties apply; and